716 F.Supp. 1162 (1989)
LITTLE ROCK SCHOOL DISTRICT, Plaintiff,
v.
PULASKI COUNTY SPECIAL SCHOOL DISTRICT, et al., Defendants,
Katherine Knight, Individually and as President of The Little Rock Classroom Teachers Association (LRCTA), et al., Intervenors,
Lorene Joshua, as next friend of minors Leslie Joshua, Stacy Joshua and Wayne Joshua, et al., Intervenors.
No. LR-C-82-866.
United States District Court, E.D. Arkansas, W.D.
June 27, 1989.
*1163 Friday, Eldredge & Clark, Little Rock, Ark., for plaintiff.
Wright, Lindsey & Jennings, Steve Clark, Arkansas Atty. Gen., H. William Allen, Sharon Streett, Dept. of Educ., Jack, Lyon & Jones, Stephen L. Curry, John W. Walker, Little Rock, Ark., for all defendants.
Norman Chachkin, NAACP Legal Defense Fund, New York City, for intervenors Joshua, et al.
Richard Roachell, Little Rock, Ark., for intervenors Knight, et al.

INTERIM ORDER
HENRY WOODS, District Judge.

I

SETTLEMENT OF STATE'S LIABILITY
The parties agreed to settle the state's liability as outlined generally by the Court of Appeals in its decision of February 9, 1988, Little Rock School District v. Pulaski County Special School District, 839 F.2d 1296, 1306, (8th Cir.) et seq. Although this settlement was effectuated by a legislative appropriation, a successful lawsuit was filed attacking all appropriations of the 1989 regular session of the Legislature. Chancellor Lee Munson held these appropriations invalid since they violated Article 5, Section 30 and Article 5, Section 40 of the Arkansas Constitution. His decision was affirmed by the Supreme Court of Arkansas in Fisher v. Perroni, 299 Ark. 227, 771 S.W.2d 766 (1989). In response to this ruling, Governor Clinton called a special session of the Arkansas Legislature to convene June 20, 1989.
A new bill, SB 151, approving the settlement was considered by the House of Representatives on Friday, June 23, 1989, having been passed by the Senate. After an amendment was placed on the bill and it was called up on third reading and final passage, a bizarre series of events occurred. A pair was stricken and one legislator's voting machine key was allegedly stolen or was misplaced. The votes were cast and the ballot sounded. The Speaker declared that the bill had failed by one vote. The House then adjourned. The bill was however sent to the Senate stamped "Failed" and without the Speaker's approval endorsed thereon. The Senate, still in session, concurred in the House Amendment and sent the bill to the Governor, who signed it. The actions of the Senate and the Governor were apparently taken to facilitate a lawsuit to determine whether the bill had actually passed.
Enactment of this bill would have avoided much further litigation and would *1164 have removed an enormous burden from my shoulders. Nevertheless, it would be a serious breach of comity for a federal court to invade the precincts of a state legislature and interpret its rules and procedures to determine whether a bill secured enough votes to become law. This is an issue for presentation to the Arkansas courts, since it ultimately involves interpretation of Arkansas statutes and the Arkansas Constitution. It may be months before this issue is settled in the Arkansas courts. Whether this bill actually became law is highly questionable. I cannot approve the settlement because the settlement is contingent upon legislative approval and a legislative appropriation to fund it. I cannot in good conscience accept this bill as having passed. Only the Arkansas courts can make this determination. I recognize that the actions of the Senate and Governor Clinton were taken in good faith to preserve the matter for judicial review. However, I am sure that both recognize the difficulty of establishing the validity of the bill's passage in the House. Adherence to the separation of powers doctrine makes courts, state or federal, highly reluctant to invade the internal workings of the legislative branch.
Be that as it may, I cannot await the ultimate resolution of this matter. The Little Rock School District (LRSD) and Pulaski County Special School District (PCSSD) are in dire financial straits. I must assume my responsibility to assess the extent of the State's liability. There are three areas involved in the state's liability:
(1) The magnet schools area;
(2) Compensatory education for the 1988-89 school year; and
(3) Other past and future liability of the State (the major component).
Hearings were held on the magnet school issue (1), supra, by Special Master McCutcheon, who filed Findings of Fact, Conclusions of Law and Recommendations on March 10, 1989 (Docket # 1169).
The parties asked me to hold my ruling in abeyance since they were working on an overall settlement and desired to incorporate his formulations therein. This was done, and the provisions with regard to the magnet funding claims of the three districts were included on pages 2-7 of the settlement agreement. Reference is made thereto for further elucidation of the Master's Findings of Fact, Conclusions of Law and Recommendations, which I now approve. The State is ordered to make immediate payment of these funds to the districts.
Special Master McCutcheon held hearings as to the State's liability for the 1988-89 school year but withheld, at the request of the parties, making findings of fact and conclusions of law pending settlement negotiations. Since the settlement has apparently now been vitiated, the parties are given twenty (20) days to submit proposed findings of fact and conclusions of law to Special Master McCutcheon so that a determination can be made as to the State's liability for the 1988-89 school year.
Hearings have not been held as to the other liability issues of the State. Those hearings will be scheduled as soon as practicable.

II

METROPOLITAN SUPERVISOR
I accept the recommendation of Special Master McCutcheon regarding the appointment of a Metropolitan Supervisor. As previously announced, Eugene Reville will serve as the Metropolitan Supervisor for a period of three years, commencing July 1, 1989. In light of the inadequacies in the proposed plans, his first priority shall be to oversee, direct and insure the development of acceptable, workable and constitutional student assignment plans. Although student assignments need not necessarily be made across district lines, if such assignments serve to reduce busing, promote educational goals, and reduce costs, they should not be precluded. While it is true that school district lines should not be "casually ignored or treated as a mere administrative convenience," it is well-settled that "[b]oundary lines may be bridged where there has been a constitutional violation calling for interdistrict relief." *1165 Milliken v. Bradley, 418 U.S. 717, 741, 94 S.Ct. 3112, 3125, 41 L.Ed.2d 1069 (1974) (Milliken I).
Contrary to the situation in Milliken I, all of the school districts in this case have been adjudicated to be constitutional violators. All have had a full and fair opportunity to be heard. Not only were the North Little Rock School District (NLRSD) and PCSSD found liable for interdistrict segregatory acts, but both have been found liable for segregatory acts within their own districts. All three districts have had four years since my consolidation order was reversed to develop independent autonomous plans to remedy the conditions that offend the Constitution within their districts. None has been successful. See, Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II).
In their objections to the Findings of the Special Master, NLRSD and PCSSD contend that the mandates of the Eighth Circuit constitute the complete remedy for their interdistrict violations. Even if that were true, the Special Master's Findings and Recommendations clearly indicate that interdistrict cooperation is required to remedy each district's intradistrict violations. In any event, all student assignments should be approved and announced by December 31, 1989 for students in all three districts.
Subsequently, the educators from each district responsible for the functions recommended for merger should present their recommendations and ideas as to the most effective and educationally sound methods for merger. The suggestions and recommendations should be presented to Mr. Reville by March 1, 1990.
In order to accomplish his charge, the Metropolitan Supervisor must have an adequate budget. Mr. Reville should prepare and submit to the court a budget for approval by August 15, 1989. The costs associated with the Metropolitan Supervisor will be apportioned as follows: the amount previously ordered for the Pulaski County Educational Cooperative (Co-op) shall be applied toward the budget of the office of the Metropolitan Supervisor. It is apparent that the Co-op has not served the function envisioned by the court when it was established. See Stipulation, Exhibit "A." In the Settlement Agreement, all parties agreed that the Co-op should be eliminated. Joint efforts should now be coordinated through the Metropolitan Supervisor. The balance of the budget will be apportioned among the school districts on a per pupil basis. Mr. Reville is authorized to employ a professional staff of up to four people. His salary is set at $98,500 per year. In addition to each district's portion of Mr. Reville's salary, it should add an amount equal to its portion of fringe benefits (e.g. hospitalization insurance), using the percentage used in calculating fringe benefits for the highest ranking person in that district. This "fringe benefit" amount will apply toward offsetting the penalty Mr. Reville will suffer by leaving the New York pension program prior to the expiration of his six-year contract in Buffalo. The Greater Little Rock Chamber of Commerce has offered its assistance in determining whether additional funds are required to make Mr. Reville whole, and if so, in attempting to secure those funds from resources in the community so as not to further burden the taxpayers.
The Metropolitan Supervisor is hereby vested with the authority to direct and oversee the completion of a comprehensive long-range desegregation plan, and to give counsel and direction to the superintendents of the school districts. He shall have access to staff members and data in all three districts. He should meet frequently with superintendents and school boards, and work cooperatively with them. In the final analysis, however, Mr. Reville must have requisite authority to get the job done. Thus, necessarily, in matters concerning desegregation and the expenditure of funds required for successful implementation of plans, he must have the final word.
While enthusiasm and goodwill cannot be effected through judicial fiat, it is my hope and expectation that the parties and Mr. Reville will work cooperatively for the good of all the children in this county. In the *1166 event of an irreconcilable difference with the direction and guidance of the Metropolitan Supervisor, any party may petition this court, setting out its objections.

III

MERGER OF FUNCTIONS
My position on consolidation of the three districts in Pulaski County is well known. In my initial remedial opinion in this case, I took the position that consolidation was the best remedy for solving the thorny problems involved in integrating these districts. My view has not changed and some of my comments have proved prophetic. "Failure to utilize a county-wide consolidation plan would exacerbate white-flight problems in the County's residential growth." Little Rock School District v. Pulaski County Special District, 597 F.Supp. 1220, 1225 (E.D.Ark.1984). There has been massive white flight from the Little Rock District. The Little Rock District is now more than 65% black at the elementary level. In that opinion I made other comments which have proved to be close to the mark. "The alternative of merely extending LRSD to lines to be conterminous with the City of Little Rock boundaries would have at most minimal and temporary results and would not adequately address the constitutional violations found in this Court's prior opinion." Id. at 1224-25. The Court of Appeals, however, chose this alternative. Little Rock School District v. Pulaski County Special District, 778 F.2d 404 (8th Cir.1985). In the four years that followed, the districts have not effectuated autonomous plans that have contributed to the desegregation of public schools in Pulaski County. When I issued my original opinion, there were four virtually all-black elementary schools in the Little Rock School District. Now the parties propose a plan under which there would be eight such schools. PCSSD still has twelve schools outside the guidelines set by the Eighth Circuit Court of Appeals. NLRSD has one school outside the guidelines and others precariously close.
For a time I considered again ordering consolidation on the basis of changed conditions, particularly since Special Master McCutcheon has found that "consolidation is now justified." He noted that "the Senate Education Committee of the 1989 General Assembly recommended passage of a bill which would have consolidated these three school districts." Because this action came late in the session, the bill did not come to a floor vote.
The legislature, in its Regular Session, requested that I strike ARTICLE II(J) of the proposed settlement agreement which reads as follows:
J. Recognition of Autonomy

The State, Joshua and LRSD recognize that PCSSD and NLRSD are independent, sovereign, desegregating school districts operating pursuant to court orders and agreements and that this agreement is both necessary and desirable to facilitate their desegregation activities as well as their cooperative desegregation activities with the LRSD and others.
This request can only be interpreted as an expression of legislative intent that I do nothing that might interfere with future consolidation of these districts, either voluntarily or by legislative act.
It is significant that the Bi-racial Committee of the LRSD endorsed unanimously the recommendations of the Special Master concerning merged functions. Their report concluded with this statement, "In conclusion, we emphasize that the only viable long term desegregation solution is mandatory, countywide assignments  consolidation." The Bi-racial Committee's "Response to Recommendations of Special Master Aubrey V. McCutcheon, Jr." is attached as Exhibit "B." The Bi-racial Committee in PCSSD apparently made no evaluation of the Recommendations, nor did the Desegregation Team in NLRSD.
However Special Master McCutcheon abandoned the consolidation approach in favor of the eventual merger of some functions. He felt that consolidation might be interpreted as contrary to the decision of the Court of Appeals, supra. While a strong case can be made for changed conditions, I reluctantly concur in his conclusion. Special Master McCutcheon has set forth a *1167 considerable number of such functions that could be merged with great financial savings to the three districts and added convenience to the patrons. As noted supra, I am asking that this problem be attacked by Metropolitan Supervisor Reville after he has dealt with the immediate problem of student assignments in a long-range integration plan. I am directing that he, in conjunction with the superintendents and boards of the three districts, explore in a cooperative manner all the areas suggested by Special Master McCutcheon.

IV

LONG-RANGE PLANS
I have reviewed the long-range plans submitted by the school districts, the Special Master's Findings of Fact, Conclusions and Recommendations, and the objections filed by the parties. Beyond peradventure the student assignment portions of the PCSSD and LRSD plans, as submitted, are insufficient and unconstitutional.
The Bi-racial Advisory Committee of the LRSD, after evaluating the Findings and Recommendations of the Special Master, unanimously concluded, "After thorough review of [Special Master] McCutcheon's statement on the plans submitted by the three districts, we endorse his recommendations, finding that generally the recommendations are sound and will promote desegregation throughout the metropolitan area."
In LRSD's proposed plan almost one-fourth of the elementary schools are contemplated to be all black. The entire mandatory busing burden at the elementary level for desegregation purposes falls on black children. LRSD, in its objections points out that a few white elementary children are bused, but the fact is that not one white elementary child would be mandatorily bused east of University Avenue. All of the historically "black" schools lie east of University Avenue, and all are proposed to be all-black incentive schools.
Double funding is promised for the all-black schools. Yet it is impossible to determine from the submissions how the funds will be spent. LRSD, in its Objections, contends that the plans were intentionally left vague so that patrons could have input into the programs. LRSD admits that the double funding is guaranteed for only six years, but contends that it "retains its commitment to provide compensatory and enhancement funding to any school which might remain racially identifiable." That "commitment" does not appear in the plan.
Several of LRSD's "general objections" to the Special Master's Findings and Recommendations require comment. LRSD states: "Most of the deficiencies in implementation of 1988-89 Plan took the form of short-lived delays and they have been cured." For the 1988-89 "stabilizing" school year, LRSD was required, in its court-approved plan, to follow a very detailed plan for improving schools with a black enrollment outside the Eighth Circuit guidelines. These schools, called "Major Enhancement" schools, were to have, inter alia, extensive building renovation, enhanced programing and a lower teacher-pupil ratio. The Special Master's Findings and Recommendations regarding LRSD's deficiencies during this "stabilizing" year were obviously made to inform the court of serious implementation problems and lack of follow-through.
LRSD next argues that "a number of alleged 1988-89 Plan violations involve things not required by the Plan," and "LRSD provided much information to the Special Master that is not reflected in the Findings." I find these two assertions troubling. LRSD apparently considers itself "bound" only by commitments explicitly set out in its plans. Yet it attempts to justify ambiguities and lack of detail in its plan by noting that "much information" was provided to the Special Master. The rather obvious question arises as to why this important information was not included in subsequent revisions of the proposed plans.
LRSD further objects that the Special Master's Findings "fail to give due consideration to the significant accomplishments of LRSD and the other parties (including the cooperation reflected in the Interdistrict *1168 Desegregation Plan and the Settlement Agreement) during the 1988-89 school year." As I have previously announced, the court does indeed welcome cooperation from the parties. However, in formulating and implementing solutions to the complex problems inherent in school desegregation, it is essential to understand the separate and distinct responsibilities of the school districts and the district court (which includes the court-appointed Special Master). The primary responsibility for constructing and presenting a desegregation plan rests with the school authorities. "The burden on a school board today is to come forward with a plan that promises realistically to work, and promises realistically to work now." Green v. County School Board, 391 U.S. 430, 439, 88 S.Ct. 1689, 1694-95, 20 L.Ed.2d 716 (1968) (emphasis original). "The Board must be required to formulate a new plan and, in light of other courses which appear open to the Board, such as zoning, fashion steps which promise realistically to convert promptly to a system without a `white' school and a `[black]' school, but just schools." Id. at 442, 88 S.Ct. at 1696. "In Brown II [Brown v. Bd. of Educ., 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955)] the Court squarely held that school authorities have the primary responsibility for elucidating, assessing, and solving these problems...." Milliken v. Bradley, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977) (Milliken II).
"The obligation of the district courts, as it always has been, is to assess the effectiveness of a proposed plan in achieving desegregation...." Id. 391 U.S. at 439, 88 S.Ct. at 1695. Further, it is "incumbent upon the district court to weigh [the school board's claim that its plan promises meaningful and immediate progress] in light of any alternatives which may be shown as feasible and more promising in their effectiveness." Id.
The United States Supreme Court has, in unambiguous terms, held that a district court (and thus a special master) should strictly scrutinize a plan that proposes one-race schools. "The district judge or school authorities should make every effort to achieve the greatest possible degree of actual desegregation and will thus necessarily be concerned with the elimination of one-race schools." Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 26, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971). The Court went on to flatly hold that "in a system with a history of segregation the need for remedial criteria of sufficient specificity to assure a school authority's compliance with its constitutional duty warrants a presumption against schools that are substantially disproportionate in their racial composition." Id. This is not new law. If counsel for the parties were surprised by the scrutiny given their proposals, they should not have been.
In its recent holding in the landmark case of Brown v. Board of Education, No. 87-1668 (10th Cir. June 2, 1989), the Court of Appeals for the Tenth Circuit has alluded to settled principles of school desegregation law. The Brown decision makes it clear that the proposed plans, as presented, could never result in unitary status for LRSD or PCSSD. I agree with the Special Master's conclusion that we have come too far to settle for a plan which leads not down the path toward integration and unitary status, but rather down a path which will require yet another "plan" at the end of six years. I further agree with his conclusion that all the children in Pulaski County, Arkansas deserve to rely upon a plan which will serve far longer than six years.
In Brown, the court held: "Where racial imbalance in student assignment is still extreme in a system that formerly mandated segregation, appellate courts have reversed findings of unitariness without looking to other factors." Id. at 18. The parties should heed the warnings of Brown. I cannot and I will not approve any plan which does not promise to lead to unitary status in these districts.
The Joshua Intervenors and the LRSD have, in their Objections, opined that since no formal hearings have been held on the plans, the Special Master's conclusion *1169 of inadequacy was premature, and that this court must hold evidentiary hearings before deciding the plans are insufficient. The argument is wholly without merit. The Eighth Circuit has held that hearings are required before the court can reject a facially constitutional plan. I have found no holding requiring that evidentiary hearings be held on plans that are facially unconstitutional and do not even purport to be within the mandates of the Court of Appeals.
All three districts object to the Special Master's Findings and Recommendations because, "[t]he legitimate concerns articulated by the Special Master are insufficient to support the remedy of interdistrict receivership."
As the parties well know, I favor voluntary, innovative and education-centered strategies for desegregation of schools. To that end, I have appointed people to assist in this case who share that philosophy. But these methods of desegregation require scrupulous attention to detail, extensive planning, adequate contingency plans, extraordinary cooperation and communication  in short, an enormous amount of work. Thus far, the parties have failed to come forward with such a well-planned desegregation proposal. Thus, all are in default.
The Special Master was charged with the duty of reviewing, evaluating and assessing the submissions of the parties. It was not his job to "write the plans," and indeed the districts would have rightly objected to such a charge. The burden was squarely upon the school authorities to devise a plan and to take whatever steps necessary to convert to a unitary system. See Green, supra.
In the absence of adequate plans proposed by the school authorities, however, judicial authority may be invoked. "Judicial authority enters only when local authority defaults." Swann, supra, at 16, 91 S.Ct. at 1276. "In default by the school authorities of their obligation to proffer acceptable remedies, a district court has broad power to fashion a remedy that will assure a unitary school system." Id. at 16, 91 S.Ct. at 1276. The Special Master has not recommended an interdistrict receivership, nor will I order that remedy. However, it is clear, that the districts require more than evaluation and critique of their submissions. Obviously, the districts need the full-time expertise of an educator with experience in the actual construction of a workable plan. For that reason, I have adopted the recommendation that a Metropolitan Supervisor be appointed. That the districts characterize this as "receivership" is both inaccurate and disappointing.
I accept the Special Master's recommendation that the concepts of attendance zones and feeder patterns be approved. I also agree that if the framework proposed by LRSD is to be accepted, details must be included. If the parties intend to proceed with the all-black incentive schools, approval will depend on exacting detail, including reasonable and workable plans for the integration of those schools.
As the parties return to the task of constructing workable student assignment plans, the well-settled principles of the law should be kept in mind.
However, it is not enough to file a plan only incorporating the policy statements.... A plan should not only specify `a positive commitment to a reasonable program;' it should also state what that program is. This embodies (1) the steps to be carried out, and (2) the time schedule to be followed in doing so.
Kemp v. Beasley, 389 F.2d 178 (8th Cir. 1968).
"The objective today remains to eliminate from the public schools all vestiges of state-imposed segregation. Segregation was the evil struck down by Brown I [Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954)] as contrary to the equal protection guarantees of the Constitution." Swann at 15, 91 S.Ct. at 1275.
"The measure of any desegregation plan is its effectiveness." Davis v. Board of School Commissioners of Mobile County, 402 U.S. 33, 37, 91 S.Ct. 1289, 1292, 28 L.Ed.2d 577 (1971).

*1170 Under relevant Supreme Court decisions, mere absence of invidious intent on the part of the school district is not sufficient to satisfy its heavy burden of proof; the district's duty is to act affirmatively, not merely to act neutrally [citation omitted]. The school district must show that no causal connection exists between past and present segregation, not merely that it did not intend to cause current segregation. The causal link between prior and current segregation is not snapped by the absence of discriminatory intent alone, or even by a firm commitment to desegregation, where it is not accompanied by action that in fact produces a unified school district.
Brown, supra at 19-20. [emphasis original]
The ultimate test of what the school district has done is its effectiveness, most significantly its effectiveness in eliminating the separation of white and minority children. While a district is not always required to choose the most desegregative alternative when it selects a particular option, the result of the sum of the choices made by the district must be to desegregate the system to the maximum possible extent.
Id. at 21-22.
Neighborhood school plans must be both neutrally administered and effective. A plan that is administered in a scrupulously neutral manner but is not effective in producing greater racial balance does not fulfill the affirmative duty to desegregate.... Ultimately, whether the use of a neighborhood school plan in a particular case is consistent with a school district's duty to desegregate turns on whether the "school authorities [have made] every effort to achieve the greatest possible degree of actual desegregation taking into account the practicalities of the situation."
Id. at 23-24, quoting, Davis, supra, at 33, 91 S.Ct. at 1290.
NLRSD has objected to the Findings and Recommendations, citing this court's prior February 27, 1987 approval of its desegregation plan. Specifically NLRSD objects to the Special Master's Findings relating to the lack of plans to deal with the substantive education elements of desegregation. NLRSD concedes that the "sufficiency of implementation" was "largely an open question during the Master's tenure." NLRSD goes on to question the authority of the Special Master to make findings relative to compliance with its desegregation plans. The objection regarding the power of the Special Master to ensure compliance in NLRSD, as well as in LRSD and PCSSD, is without merit and need not be commented upon.
NLRSD's arguments of "res judicata" and/or mootness have been made and rejected by the court of appeals:
The district court has been instructed to maintain jurisdiction until full integration is achieved.... The initial motion in this case is another example of the court's continuing jurisdiction over desegregation of the North Little Rock schools. This case should not be dismissed and a case or controversy sufficient to satisfy Article III will exist until such time as the district court determines that a unitary system of education has been achieved and the North Little Rock School District is thoroughly integrated.
As the Fifth Circuit has stated, "a school system is not automatically desegregated when a constitutionally acceptable plan is adopted and implemented." United States v. Texas Education Agency, 647 F.2d 504, 508 (5th Cir.1981). See Pate v. Dade County School Board, 588 F.2d 501, 504 (5th Cir.) (per curiam), cert. denied, 444 U.S. 835, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979) ("[we have recognized] that the district court has a continuing responsibility to appraise the system in the light of actual conditions and experience and make required changes to assure the maintenance of a unitary system"); Thompson v. Madison County Board of Education, 496 F.2d 682, 686-87 (5th Cir.1974).
Davis v. Board of Education of North Little Rock, 674 F.2d 684 (8th Cir.1982).
I have reviewed the transcripts of compliance status conferences before the *1171 Special Master. A desegregation plan must encompass more than data collection. Furthermore, when high level administrators are unaware of the plan, and state that there is no plan to remedy certain deficiencies, then there is, in fact, no plan, regardless of the volumes of written material presented by attorneys to the court. The district court is obliged to "appraise the system in light of actual conditions and experience." Id. at 689. "Moreover, whatever plan is adopted will require evaluation in practice, and the court should retain jurisdiction until it is clear that state-imposed segregation has been completely removed." Green at 439, 88 S.Ct. at 1695.
NLRSD asserts that it "has chosen to focus not on race and racial disparity but on achievement deficits of individual children." Of course, the eventual goal of any district ought to be "colorblind," race-neutral policies with respect to all its endeavors. However, in order to counter the many years of de jure color-conscious, discriminatory policies and practices, some affirmative, race-conscious, remedial measures are required. "Under the relevant Supreme Court decisions, mere absence of invidious intent on the part of the school district is not sufficient to satisfy its `heavy burden' of proof; the district's duty is to act affirmatively, not merely to act neutrally." Brown at 19.
In fact, the NLRSD Supplementary Plan states:
The District recognizes, however, that the regular curriculum is often insufficient in aiding disadvantaged students, particularly disadvantaged minority students suffering the effects of centuries of societal discrimination, to achieve mastery of basic skills. Therefore, within the framework of a comprehensive curriculum, which meets and exceeds State Standards and which is structured to meet the varying individual needs of all students, the North Little Rock School District must address identified remedial needs of disadvantaged minority students.
NLRSD Supplementary Plan, at 4.2.
Compensatory and remedial programs must be aimed at correcting the specific Constitutional violations of the NLRSD, rather than "the effects of centuries of societal discrimination." Thus the remedy must be designed "as all remedies are, to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." Milliken I, at 746.

V

CONCLUSION
The Findings of Fact, Conclusions and Recommendations of Special Master McCutcheon, attached as Exhibit "C," are approved as submitted, except as specifically noted in this Order. As previously announced, the school assignments in LRSD for the 1989-99 school year are approved as recommended by the Special Master, except that the pairings of Fulbright, Romine, McDermott, and Franklin shall not be implemented. Instead, LRSD is directed to focus time and effort toward completing the Incentive School programs.
In PCSSD, for the 1989-90 school year, the Special Master's recommendations for a 42% maximum black enrollment is approved. PCSSD will be permitted to use voluntary efforts to meet this goal. NLRSD will be permitted to use voluntary efforts for the 1989-90 school year to bring its schools into compliance with guidelines of the Court of Appeals for the Eighth Circuit.
All proposals and plans submitted by the parties and recommended for approval by the Special Master are approved.
IT IS SO ORDERED.

EXHIBIT A

STIPULATION OF THE LITTLE ROCK SCHOOL DISTRICT, THE PULASKI COUNTY SPECIAL SCHOOL DISTRICT, AND THE NORTH LITTLE ROCK SCHOOL DISTRICT FOR THE CREATION OF A PULASKI COUNTY EDUCATIONAL COOPERATIVE

Filed Feb. 19, 1987
1. The State currently funds fifteen (15) regional educational cooperatives to provide *1172 service to school districts within identified geographic areas. Staff development, distribution of audio visual resources, "teacher center" activities, and purchasing are among the services currently being provided.
2. The three (3) school districts in this litigation were instructed by the Eighth Circuit Court of Appeals to explore cooperative programs. Little Rock School District v. Pulaski County Special School District, 778 F.2d 404, 436.
3. The parties agree that an educational cooperative should be formed and modeled after the fifteen (15) other regional cooperatives; and funded by the State in the same manner as the existing cooperatives. The name of the cooperative should be Pulaski County Educational Cooperative.
4. The parties to the stipulation agree the creation of interdistrict magnet schools, M to M transfers, and interdistrict transportation systems increase the need for cooperation and provides new avenues for further cooperative ventures. The opportunity to participate in cooperative ventures would strengthen each district's ability to provide an equitable and effective educational program for its students.
5. An interdistrict venture of this type would facilitate each district's desegregation efforts and would aid the avoidance of unanticipated effects of one district's plan on the plans of the other districts.
6. The parties agree that, within the structure of the educational cooperative, they will explore the possibility of cooperative efforts of mutual benefit. These will include, but will not be limited to, discussing the possible cooperative efforts listed by the Court of Appeals in its opinion, LRSD v. PCSSD, 778 F.2d 404, 430-31 (8th Cir.1985).
7. The governing body of the cooperative will be comprised of the Superintendents of the member school districts.
 Respectfully submitted,
 KAPLAN, BREWER &
 MILLER, P.A.
 415 Main Street
 Little Rock, AR 72201
 (501) 372-0400
 HOLLINGSWORTH &
 HELLER, P.A.
 415 Main Street
 Little Rock, AR 72201
 (501) 374-3420
 JOHN M. BILHEIMER
 324 West 14th Street
 Little Rock, AR 72202
 (501) 374-4944
 PULLIAM LAW
 OFFICES, P.A.
 Suite 350, Gazette Building
 112 West Third Street
 Little Rock, AR 72201
 (501) 371-3888
 By: Janet L. Pulliam
 JANET L. PULLIAM
 Attorneys for Little Rock School
 District
 NEAL, GERBER &
 EISENBERG
 208 S. LaSalle Street
 Chicago, IL 60604
 WRIGHT, LINDSEY &
 JENNINGS
 2200 Worthen Bank Building
 Little Rock, AR 72201
 By: M. Samuel Jones
 M. SAMUEL JONES
 Attorneys for Pulaski County Special
 School District
 JACK, LYON &
 JONES, P.A.
 3400 Capitol Tower
 Capitol at Broadway
 Little Rock, AR 72201
 (501) 375-1122
 By: Stephen W. Jones
 STEPHEN W. JONES
 Attorneys for North Little Rock
 School District
 TED SHAW, ESQUIRE
 Legal Defense Fund
 99 Hudson Street
 New York, NY 10013
*1173
 JOHN W. WALKER, P.A.
 1723 Broadway
 Little Rock, AR 72206
 By: [Signature]
 Attorneys for Joshua Intervenors

EXHIBIT B

Response From the Bi-racial Advisory Committee to Recommendations of Special Master Aubrey V. McCutcheon

PREAMBLE:
The Bi-racial Advisory Committee, a community based group, has been in a position to study the Little Rock School District's plan, to discuss the plan with District staff, and to get input from a cross section of the community. The composition of the Committee has assured discussion that mirrors many of the sentiments of the patrons of the Districts. Our conclusions in this report are based on close study and discussion of the Recommendations of the Special Master.
* After examination of the Recommendations, we find that the environment created by the media and others through emotional and inflammatory statements has miscommunicated the reality of the situation to the public. We perceive that a disservice has been done to the citizens of Pulaski County and has contributed to the instability we all decry.
After thorough review of McCutcheon's statement on the plans submitted by the three districts, we endorse his recommendations, finding that generally the recommendations are sound and will promote desegregation throughout the metropolitan area. We also observe that the Special Master's recommendations are not that far removed from the previous recommendations by the Little Rock School District.
* While we recognize that there may be some inconsistencies in the findings of facts as outlined by the Special Master, this Committee has focused on the recommendations for the Long Range Desegregation Plan. Desegregation is the primary objective of this Committee; therefore from the viewpoint of desegregation we recommend that the Board forego any appeal process and concentrate on implementing the recommendations of the Special Master.
We have set out below comments and recommendations.

Response to Recommendations

Recommendation I. Metropolitan Supervisor of Desegregation Services & Programs

This committee agrees with the Special Master's recommendation of a metropolitan supervisor. While we considered other actions, we found that the Special Master's recommendations were the most feasible.

Recommendation II. Finance Statement with the State

We concur in the Master's recommendation of the settlement.

Recommendation III. Student Assignment Plan

(We have only addressed the Little Rock Plan)
The Special Master has pointed out a lack of ability of the District to outline a detailed plan for desegregation. It is our finding that a countywide desegregation plan is inevitable and should be developed. We agree in principle with the program outlined in the March 1989 plan for Incentive Schools. However, we recognize, as did the Special Master, that the Incentive Schools should be temporary. The Incentive Schools as currently planned should only be a short term solution. Mandatory attendance zones should be established on a countywide bases. In compliance with the Special Master's recommendations the District should develop a plan for integrating the Incentive Schools or phasing them out over the course of the settlement. The Bi-racial Committee needs to be involved in the development of incentive programs and the location of those programs.
* As we have mentioned earlier, we endorse the mandatory assignment of students across district lines.
* We endorse the merger of functions as outlined.

*1174 Recommendation IV. School Assignment for the 1989-90 School Year:

We also endorse the Special Master's recommendation for the School assignment plan; however, because it is not feasible to implement all recommendations for the next year, the Board should consider reasonable assignments for the 1989-90 year. In essence for 1989-90, the District should ask the Court to allow it to make its attendance zone assignments as specified by the Master with these exceptions:
1. Kindergarten students should be assigned by attendance zones.
2. Dunbar should not be moved to an international studies/gifted and talented center for 1989-90. The District and Court should review the implications of making Dunbar an interdistrict magnet.
3. If zone attendance is used, we do not believe that pairings is necessary. However, for the next year the Board should ask the Court to reconsider the pairing of schools by split grades (K-3; 3-6).
* We agree with the Special Master that grandfathering beyond 1989-90 is inconsistent with desegregation objectives.

Recommendation V. Administration and Faculty

We agree with the Special Master's recommendation; however, we encourage the Board to begin discussion and coordination with the union. We recognize that it is not feasible to make changes for the 1989-90 year. Planning for these changes should take place during 1989-90 and be consistent with development of the zone assignment plan and other interdistrict remedies.

Recommendation VI. Portable Buildings

We concur with the Special Master's recommendations and suggest that the District explore the feasibility of additions to existing structures.

Recommendation VII. Additional Magnet Schools or Programs

We concur with the Special Master's recommendation; and suggest that the District declare a Magnet School moratorium.
In conclusion, we emphasize that the only viable long term desegregation solution is mandatory countywide assignments  consolidation.

EXHIBIT C

FINDINGS AND RECOMMENDATIONS OF THE SPECIAL MASTER

INTRODUCTION
It is safe to conclude that the desegregation problems in Pulaski County have been in existence for a number of years and cannot be resolved with mere intradistrict remedies. Any intradistrict remedy in one district must have the capability of enhancing intradistrict remedies in the remaining districts. The three districts cannot resolve the desegregation crisis in Pulaski County without cooperation and collaboration. In addition to cooperation and collaboration, the success or failure of school desegregation in Pulaski County depends on the effectiveness of the interdistrict assignment program. The demographics of the Pulaski County Special School District and the Little Rock School District are such that each district must rely on the other to meet the goal of desegregating all schools. Any long-range desegregation plan in the Little Rock School District will have to include an effective interdistrict assignment program in order to be successful.
(October 3, 1988 Proposed Desegregation Plan, § 1, p. 13.)
After many months of working with the Little Rock School District (LRSD), the Pulaski County Special School District (PCSSD) and the North Little Rock School District (NLRSD), the inescapable conclusion is that the only sensible long-term solution to the desegregation challenges in Pulaski County, Arkansas is a Metropolitan remedy, if our commitment is to consider the education of children first. A sensible Metropolitan plan would reduce bussing for all children, and would reduce nonpedagogical *1175 costs, thus increasing the dollars available for the direct instruction of children. While the districts admit in their proposed plans the need for interdistrict remedies, the lack of substance in their plans results in a mere acknowledgement of a need to cooperate.
All three districts face challenges in assigning students to ensure compliance with court orders. The Eighth Circuit guidelines require that the black percentage in all schools be plus or minus 25% of the black population of the district. All of the districts have reasonably interpreted that guideline to be calculated by organizational level. Even so, in light of the disparate black elementary populations in PCSSD (27%), and in LRSD (over 65%),[1] the guidelines create vastly different standards for schools in the metropolitan area. LRSD elementary schools must have black populations of between 51% and 76.5% and the PCSSD elementary schools must be between 20% and 34% black. The variance often creates paradoxes: All of the PCSSD schools with black populations currently exceeding its guidelines would be within the LRSD guidelines or would exceed the allowable percentage of whites.[2] It is difficult to rationalize how two schools, perhaps only several hundred yards apart, albeit technically in different school districts, could have such vastly different standards for determining whether each is acceptably desegregated.
Compliance is further complicated by the peculiar geography of the districts, with PCSSD's 730 square miles winding around and through the two city districts. As noted in the Interim Recommendations of August 2, 1988, much of the PCSSD is rural and undeveloped, making transportation difficult. The segregated housing patterns in all three districts, and the Eighth Circuit requirement that no mandatory bus ride for desegregation purposes can exceed forty-five minutes, when combined with the other factors, create an enormous challenge for desegregation planners.
All three districts face the additional critical challenge of developing strategies to eliminate the unconscionable achievement disparity between white and black students.
As this court and all of the parties well know, the easiest and least expensive way to technically accomplish desegregation, in terms of pupil mix, is to use mandatory cross-town bussing. To the credit of the parties, they have consistently expressed a desire to place emphasis, instead, on excellence and improved desegregated educational opportunities for all children, with full knowledge that such an endeavor would be far more costly in terms of dollars, time and commitment than a simple mandatory bussing plan.
The Court of Appeals for the Eighth Circuit rejected consolidation of the three districts as too drastic a remedy in 1985. Little Rock School District v. Pulaski County Special School District, et al, 778 F.2d 404 (8th Cir.1985). However, in that opinion, even without the facts presently known, the Court urged the district court to "seriously consider[]" the PCSSD proposals with respect to cooperative programs. The PCSSD proposals are set forth on pages 430-31 of the Court's opinion:
PCSSD's plan requires all students in the three districts to choose the school they wish to attend, selecting from among any of the schools in the three districts. Students who do not receive their first or second choice of school due to oversubscription are to be "mandatorily assigned (to another school) by an interdistrict administrative committee composed of administrative personnel from each of the three districts."
Enrollments are to be controlled "to racially balance all schools in each of the controlled three districts at proportions approximating that of countywide public school enrollment in the preceding school *1176 ... Specialty schools and specialty programs will be racially balanced at the countywide proportion plus or minus five percentage points" ... To facilitate interdistrict transfers, several policies are proposed, including the "effective schools" model and uniform grade structure including kindergarten, uniform grading, attendance and discipline policies.
PCSSD proposes that the three districts share vehicle capacity, routing and supervision of the transportation system, that they consider the joint contract purchase of a computerized routing and scheduling system, and the purchase of identical vehicles, the joint purchase of fuel and parts, the sharing of repair facilities and enforcement of common regulations.
* * * * * *
PCSSD also proposed the formation of several tridistrict committees which would discuss cooperative ventures in several areas such as food preparation and delivery and maintenance service. Under this proposal, the three district controllers would meet in committee to discuss details of cost sharing and to explore other areas of financial cooperation, including establishment of a single millage rate in Pulaski County, coordinated millage campaigns, coordinated marketing of revenue bonds, common audit and accounting procedures, joint proposals for special grant or project funds and joint bidding and purchasing practices.
... PCSSD also proposes interdistrict cooperation on a variety of personnel matters. Id. at 430-31.
The districts have had four years, acting autonomously, to develop and present plans which comply with court orders, plans that assure high-quality desegregated education for each child in Pulaski County both now and in the future. All three districts and the State Defendants have been adjudicated constitutional violators. They have been given ample opportunity to develop independent, autonomous plans. After four years, all three districts have failed. All are in default.
Consolidation is now justified. Only NLRSD has presented a plan within the Eighth Circuit Guidelines for acceptable black/white populations. But, even NLRSD is now out of compliance with the pupil mix elements of its plan, and has no plan whatsoever to deal with the substantive education elements of desegregation: i.e., elimination of achievement disparities, over-representation of blacks in special education programs and disciplinary actions, and under-representation of blacks in Talented and Gifted programs, effective schooling for all children, effective desegregation in the areas of faculty, staff, students, facilities, transportation, extracurricular activities, etc.
While consolidation is now justified, I am instead recommending the use of a Metropolitan Desegregation strategy before concluding that consolidation is the only available solution.
Because the development of the Metropolitan Desegregation remedy will require extensive additional time and expertise, it is necessary for me to submit recommendations which permit continued progress to be made during the 1989-90 school year. Accordingly, I submit to you the following Findings and Recommendations consistent with the direction contained in the orders issued October 15, 1987 and February 11, 1988.
As you will note, I have not found the plans submitted by the parties to be workable school desegregation plans. Therefore I can recommend only portions of those submissions for implementation in 1989-90 and we are forced to await the formulation of a "complete desegregation plan" by a newly appointed metropolitan desegregation authority.

FINDINGS OF FACT

The Long-Range Plan(s):
1. The parties were directed to submit the final draft of long-range plans no later than September 30, 1988. In an effort to ensure that the parties spent time on task, *1177 they were required to submit a preliminary draft several weeks before the September 30 deadline.
2. Following submission of the preliminary draft the parties were informed of the need for greater detail and clarity in several areas.
3. A long-range plan was submitted on October 3, 1988 ("October Plan").
4. Both LRSD and PCSSD were directed to hold public meetings to gather community reaction, suggestions and input. In order to ensure compliance, the districts were required to submit summaries of their public meetings.
5. The October Plan, which was summarized and publicized for public meetings included the following:
a. The proposal to add a new wing to Franklin Elementary School to allow Franklin to house students affected by the closing of King Elementary School. The plan added: "It is by no means certain, however, that all or even most of the King students will be reassigned to Franklin in 1989-90."
b. They proposed the construction of a new Washington Elementary school to serve as a 600-seat Interdistrict Magnet School. A tridistrict survey was to be conducted in October 1988 to determine a theme. Washington's location was represented to be a "major asset to its ability to attract white students." The LRSD students who live outside of Pulaski County, but did not present a plan to do so.
c. Mitchell Elementary was proposed as an Intradistrict Magnet (restricted to LRSD students).
d. Rockefeller was also proposed as an Intradistrict Magnet. "Final" selection of the theme for Rockefeller was to be determined from the tridistrict survey.
e. LRSD proposed to close Ish as an elementary school after the 1988-89 school year and reopen it as an early childhood center. The plan noted: "The Eighth Circuit Court of Appeals views early childhood education as an important component of a comprehensive desegregation plan. It is believed that early intervention will nullify the need for compensatory/remedial programs in the higher grades."
f. Gibbs International Studies Magnet was proposed to be reorganized as a K-3 I/S Magnet.
g. Rightsell Elementary was proposed as the grade 4-6 complement to Gibbs.
h. Dunbar Junior High School was proposed to have an International Studies school-within-a-school.
i. A new Stephens school was to open for the 1990-91 school year at a new location "due west of and adjoining the Capitol Hill Complex," as an Interdistrict Magnet, with a 600-seat capacity, but no precise location was identified.
j. A new King Elementary school was to open in 1990-91 as an Interdistrict Magnet School. The plan indicated that the new King Elementary school would be located in the "general area" bounded by I-630, Chester Street, 9th Street and Center Street, but no precise location was ever identified.
k. The plan proposed the use of attendance zones for all the non-magnet, "non-enhancement" schools so that "most neighborhoods" would be able "to attend a particular school as a group."
l. Eight Kindergarten through grade six Incentive Schools were proposed: Carver (in the building abandoned when new Carver Magnet was built), Franklin, Garland, Ish (also inconsistently proposed as an Early Childhood Center), Mitchell (also inconsistently proposed as an Intradistrict Magnet School), Rockefeller (also inconsistently proposed as an Intradistrict Magnet School), Rightsell (also inconsistently proposed as the 4  6 International Studies Magnet School), and Stephens (also inconsistently proposed as an Interdistrict Magnet School).
m. Kindergarten students were to be excluded from the mandatory attendance plan with the words, "neighborhood kindergarten assignments will be made with the full understanding of where these students will attend school in the first grade."
*1178 6. The October 1988 Plan also included the following disclaimer: "The uses described above for Washington, Mitchell, Rockefeller, Ish and Rightsell may change if those schools are needed to house enhanced schools."
7. In October, the parties asked for an initial reaction and were informed that, while many of the general concepts were acceptable, the "plan" was not a "plan" but rather "a plan for a plan" and could not be recommended until the parties set forth the "operational details" and resolved the inconsistencies. The parties were advised to take the October "plan for a plan" to their patrons for discussion and input, and to resubmit a detailed plan.
8. Public, on-the-record hearings on the October submission, as revised, were scheduled for January 5 and 6, 1989, then were rescheduled for January 12 and 13, 1989, at the request of PCSSD so that PCSSD could complete the required public meetings.
9. On January 5, 1989, the parties were informed, on the record, that the undersigned would make on-site visits to all proposed school sites and that at least one representative from each party should go along so that questions concerning locations and programs could be answered. The parties still had submitted no written plan since the October "plan for a plan."
10. On January 6, the undersigned, along with at least one representative of every party, began a tour of sites proposed under the October submission.
11. The parties were unable to locate the site proposed for either Stephens or King. The parties indicated that one of the lawyers, then residing in Pittsburgh, Pennsylvania, was the person who really knew where the proposed schools were to be located.
12. Representatives from Joshua Intervenors and LRSD disagreed about how students were to be assigned/recruited to the Incentive Schools. The parties were told to come to some agreement or present position papers. Later in the week, Joshua Intervenors and LRSD presented opposing positions as to how Incentive Schools should be populated. The Incentive School Education Program still was not described with detail.
13. Later, on January 6, the parties were presented a list of questions concerning the inconsistencies, double designations of schools, etc., in the October Plan, and cautioned that patrons were likely to raise the same questions in the up-coming public hearings.
14. Public hearings were held on January 12 and 13, 1989. The transcripts of those public hearings, in which patrons, citizens and all who were interested were invited to make public comment on the plan, are being submitted with this recommendation, along with all of the other transcripts, in compliance with Fed.R.Civ.Proc. 53.
15. LRSD asked that they have until January 30, 1989 to submit their "final plan." PCSSD asked that they be given two weeks after the LRSD submissions to submit "final plans," since the plans were interrelated. These requests were granted.
16. The LRSD delivered another plan the first week in February, dated January 31, 1989 (January Plan).
17. Highlights of the January Plan are as follows:
a. Rockefeller was to be an Incentive School.
b. Rockefeller was to be an Interdistrict School "if LRSD and PCSSD agree."
c. The Home-Mart building in West Little Rock was to be an Interdistrict School.
d. Romine (in LRSD) and Baker (in PCSSD) were to be paired. The January Plan listed five "options" for the Romine/Baker pairing.
e. Dunbar Junior High was described in "three scenarios" which included the following possibilities: an Intradistrict Magnet, an Interdistrict Magnet, or mandatory attendance zone assignments with an enhanced educational program.
*1179 f. Washington was proposed as a 1050 seat elementary school (the October plan had proposed 600 seats).
18. The parties were given a nine-page list of questions and concerns about the LRSD January Plan in early February.
19. On February 15, 1989 the parties presented an "Interdistrict Plan" (February Plan) which proposed that the following schools become Interdistrict Schools: Baker (In PCSSD), Harris (PCSSD), Romine (LRSD), Stephens (LRSD), Crystal Hill area (PCSSD), and King (LRSD).
20. The February plan proposed that students residing in the host district of an Interdistrict School be mandatorily assigned, and that students living outside the host district be recruited.
21. The February Plan proposed that "[t]he Interdistrict Schools [] be populated primarily by black students from LRSD and by white students from PCSSD or beyond Pulaski County."
22. The February Plan stated that all parties had as a "high priority" the elimination of educational achievement disparities between black and white children. The plan further states that each district "shall devise its own plan for eliminating disparities...."
23. On March 23, 1989, another "final plan" was submitted.
24. The March 23, 1989, plan contained a number of proposals which were unclear, confusing and undeveloped, including, inter alia:
a. The Elementary Academies were proposed to "establish a racial balance at each school of 55% black and 45% white with a variance of 5%. The recruitment of white students to Elementary Academies may increase the percentage of white students at these schools but no school shall have a racial composition of greater than 60% white." Those two sentences are inconsistent whether the "5% variance" refers only to blacks, only to whites, or to both blacks and whites.
b. Children assigned to Elementary Academies would be guaranteed they would be permitted to attend school with children in their residential area. However, students initially assigned to Incentive Schools, but who chose instead to enroll in an integrated school would be assigned to a school "to be selected by LRSD in accordance with desegregation considerations." There is nothing in the plan to assure that a black child who chose to attend an integrated school could attend that school with other children from his or her residential area.
c. LRSD continued to include proposals to install portable buildings "to accommodate overflow situations."
d. LRSD continued to insist upon allowing first preference in school assignments to students who elect to stay in current schools, even though the current school is not the school others in their residential area would attend.
e. No details were added in the March 23, 1989, plan to the education component of the Incentive Schools.
25. The parties were asked to nominate persons to serve on a "Refinement Team." From the nominations, the Special Master selected ten persons to serve. Persons with expertise in all relevant areas were selected. At least one person was selected from each party's list of nominees. They were informed they could not function as advocates for any party.
26. The Refinement Team was asked to meet with the Special Master, determine and provide analysis, ideas, suggestions and critique of the 1989-90 phase of the long range plans submitted by LRSD, NLRSD and the PCSSD.
27. The Refinement Team met with the Special Master on March 23, 24, 25 and 26, 1989.
28. From discussions of the Refinement Team, twelve pages of questions and concerns about the plans were compiled. The Refinement Team was not asked to resolve those matters.

*1180 Funding and Compliance Hearings:

29. In August 1988, funding hearings began for the three districts to pursue claims against the State of Arkansas for desegregation costs. At the request of the parties, the funding issues were trifurcated. By stipulation of the parties, the dispute over the State's share of the magnet costs was litigated first. That issue was finally submitted for decision on November 30, 1988.
30. Board members and superintendents were not required to be present for the litigation of the funding issues. Some did attend.
31. In the midst of the Funding Hearings, beginning September 21, 1988, it was revealed that LRSD had made unauthorized, unilateral changes in the implementation of its 1988-89 court-approved desegregation plan,[3] including, inter alia, the following:
a. A library media specialist required in the plan had not been hired, nor had the district advertised for the position;
b. The four schools in which a library/media pilot project was required had not been selected, nor was the pilot project in place;
c. Custodial services had been cut in Major Enhancement Schools;
d. Supervisory staff members at the central offices level were eliminated;
e. The Effective Schools plan had been eliminated;
f. Funding for staff development was reduced;
g. Library clerk positions were eliminated;
h. Development of the media program was halted;
i. Inservice training was not being conducted as required;
j. Homework centers had been changed from an approved evening program, 6:00 p.m. until 8:00 p.m., to an afternoon program, 2:30 p.m. until 4:50 p.m., with no prior notice to the other parties or to the court. No analysis of the effects of the change was done by LRSD before the change was made;
k. Wiring and installation of the closed circuit televisions for Garland Major Enhancement School's communication specialty program, to have been completed by August 15, 1988, had not taken place;
l. The materials and supplies for the yearbook project at Garland Major Enhancement School had not been ordered as required in the plan;
m. The two typewriters required for the communications specialty program at Garland Major Enhancement School were not ordered;
n. Inservice training at Ish was not being conducted as required;
o. The greenhouse at Ish School had not been installed as required in the plan due to "a breakdown ... in communications" because "the ball got dropped";
p. The Assistant Superintendent for Schools testified that she had never been told that renovations at the Major Enhancement Schools were to be top priority as required;
q. The custodian at Rockefeller, to have been hired by August 17, 1988, had not been hired;
r. The Artist-in-residence program required as a part of the educational enhancements at Stephens Elementary School was eliminated in favor of inservice for teachers;
32. The parties were informed of the serious nature of departing from court-approved *1181 plans, and were warned that "... a determination will be made as to whether or not the things that [the districts] have not completed are still going to be completed, allowed to be completed by the district or whether somebody else is going to be called in to see to it that they are completed."[4]
33. A status conference, held September 23, 1988, revealed that, in addition to the failures to comply revealed in the Funding Hearing, the LRSD had also unilaterally made other changes in its approved desegregation plan, including inter alia the following:
a. LRSD had failed to hire or advertise for positions for four evaluation specialists required in the court-approved 1988-89 plan;
b. LRSD had failed to hire the mass media coordinator required as a part of the educational enhancements at Garland;
c. LRSD had failed to hire a laboratory aide required as a part of the educational enhancements at Stephens;
d. LRSD had failed to establish a pilot intervention learning center as required;
e. As of September, LRSD had failed to send out a survey to students which was to have been sent June 15, 1988;
f. LRSD had failed to conduct workshops for board members, as directed in the 1988 plan;
g. LRSD had failed to install playground equipment required as a part of the educational enhancement plan at Stephens;
h. LRSD failed to install playground equipment required as a part of the educational enhancements at Ish;
i. LRSD failed to complete site work required as a part of the major enhancements at Mitchell;
j. LRSD reduced janitorial services at all Major and Minor Enhancement Schools in violation of the approved plan;
k. LRSD failed to secure Partners in Education for two Major Enhancement Schools, Rockefeller and Mitchell, as required in the plan; and
l. LRSD had unilaterally changed the starting time for Parkview Interdistrict Magnet High School to the starting time of its Junior High Schools.
34. The parties reported that LRSD's unilateral change in the starting time for Parkview Magnet had a detrimental effect on the school.
35. The Interdistrict Transportation Authority (ITA) reported that Parkview Magnet could be returned to a first-bus-run-schedule (an earlier schedule) with the purchase of additional busses. The representative from the State agreed that the State would purchase the required number of busses.
36. On October 11, the Magnet Review Committee forwarded the report of the ITA recommending the purchase of additional busses by the State in order to return Parkview to an earlier starting time. The report also revealed that LRSD had changed starting times for the Elementary Magnets and recommended that the Elementary Magnets also be returned to the earlier starting time at the beginning of the second semester.
37. On October 24, 1988, the district court entered an order directing the Arkansas Department of Education to immediately proceed with the lease/purchase of the additional busses to ensure their availability by January 2, 1989.
38. A special public status conference was held on October 19, 1988, for all board members and administrators of the three school districts as well as the State Board of Education members and administrators.
*1182 39. The purpose of the status conference was to encourage: (1) "board members from the various districts to find out that there are some areas in which you may be able to cooperate and thereby be far more cost-effective in the manner in which the desegregation plans are implemented;" and (2) compliance with court orders.
The board members were reminded of the proper process for making changes to court-approved plans: "[I]f there is a financial need to make a change, it means you follow a process for doing so. And I would suggest to you that that process first starts with your talking to the other parties in the lawsuit about the prospective change, finding out what their positions are, and then somehow informally referring that to the Special Master for the purpose of determining whether there can be some alternative suggestions, then making a formal presentation of the proposed change, if you think it's important to make the change, giving the other parties an opportunity to respond and then awaiting some ruling from the Court or a recommendation from the Special Master regarding the change."
40. The PCSSD reported twelve schools outside the Eighth Circuit guidelines.
41. PCSSD had not made a checklist to ensure compliance with all commitments made in the agreement with the Joshua Intervenors which, in part, justified the stabilizing year for 1988-89.
42. NLRSD reported that Lakewood Junior High School had fallen outside the Eighth Circuit guidelines.
43. The parties were urged to work collaboratively on "specific plans as it relates to the suspension and expulsion of black males ... you need not all be experimenting separately. You might be doing some things better together."
44. NLRSD had failed to make a report in May, 1988, regarding student participation in extracurricular activities by race. Consequently, NLRSD had also failed to comply with that portion of its plan requiring conferences with principals and/or organizations to consider suggestions regarding disproportionality.
45. NLRSD had not collected information regarding the number of students, by race, transported for desegregation.
46. NLRSD reported that it kept no records of the number of all-black or virtually all-black classes.
47. The "desegregation facilitator" for NLRSD:
a. did not know if there were any black teachers of the Gifted and Talented;
b. did not know whether there was a plan to recruit black teachers to teach the Gifted and Talented; and
c. stated that NLRSD had no goal to integrate the teaching staff of the Gifted and Talented.
48. There is no Office of Desegregation in NLRSD.
49. A "desegregation team" in NLRSD meets approximately every two to three months to look for evidence of segregatory practices in staff assignment. (Monthly meetings of the Desegregation Team were reported at a later status conference.)
50. In 1987-88, all teachers of the Gifted and Talented in NLRSD were white.
51. There is no specific plan in NLRSD to recruit black teachers of the Gifted and Talented.
52. The personnel director in NLRSD has no experience or training in identifying and recruiting black staff members.
53. NLRSD was providing only Chapter I programs to remediate and compensate educational deficiencies of black children. NLRSD was providing the same Chapter I programs it would provide if the District were not under a court order to desegregate.
54. No compensatory programs are in place in response to court-ordered desegregation in NLRSD.
55. NLRSD relies on "creative financing" to fund areas of need for children's remedial and compensatory education in NLRSD.
*1183 56. NLRSD had made no comparison of how black and white pupils in NLRSD compared with LRSD and PCSSD.
57. NLRSD had never disaggregated MAT-6 standardized test scores by race to determine whether there was educational achievement disparity.
58. NLRSD was directed, October 19, 1988, to provide a breakdown of student achievements, by race and to prepare a plan to deal with any disparity by race which was revealed.
59. NLRSD was directed to report at the next status conference whether NLRSD was taking measures to deal with any disparities discovered in the disaggregated test data, and, if so, what the measures were.
60. NLRSD acknowledged the need to have a monitoring system to discover whether disparities exist, and indicated that monitoring was an area "we intend to address."
61. NLRSD does not have a biracial committee comparable to those in LRSD and PCSSD to perform a monitoring function and to be available to give advice to the district on matters relating to desegregation.
62. NLRSD had no explanation for the fact that 40% of the students in special education classes were black males, while black males make up 20% of the student population in NLRSD.
63. The NLRSD superintendent and cabinet which form the NLRSD "desegregation team" had never discussed the disproportionality of referrals of black males to special education classes.
64. The NLRSD superintendent and cabinet had never discussed the educational achievement disparity between black and white students.
65. The NLRSD Director of Special Education indicated that: "many of these [special education] issues are going to be dealt with in a tridistrict manner or through tridistrict efforts ... We really haven't had a chance to do a lot of that, and I think [cooperative staff development] will help pull us together."
66. LRSD reported that all of its Board members still had not participated in the workshop on human relations, as required in the 1988-89 plan and reiterated during the September compliance hearings.
67. The districts were again informed: "You heard me say several times  and I can't say it too often  and I will try to say it more pleasantly; but every commitment that was made in the plan that we used to justify the stabilizing year must be adhered to. We may be in difficulty with the Eighth Circuit anyway. If we do all of the things that we said we were going to do during the stabilizing year, I think we ought to be able to convince the Eighth Circuit that we did what was the wisest thing to do."
68. During the status conference, board members were invited to make comments and ask questions. Several expressed understanding and intent to comply.
69. On December 2, 1988, the LRSD superintendent sent a letter to parents of students at the following non-magnet schools: Mabelvale Elementary, Terry Elementary, and Western Hills Elementary. The letter informed parents that, effective January 23, 1989, their schools would change to a later starting time. The letter further stated that, "The changes are necessitated by the order of Special Master Aubrey V. McCutcheon in concurrence with all parties in the Little Rock Desegregation case."
70. In fact, the LRSD had not previously revealed to the Special Master or the parties that the starting times of three non-magnet elementary schools would be changed. Therefore, the LRSD was advised to send, and did send, a letter of retraction to the parents of the non-magnet students. The LRSD then arranged transportation to avoid a change in the starting times.
71. The parties were asked to consider the possibility of a single transportation authority for the tridistrict area.
*1184 72. On December 15, 1988, attorneys for each of the parties asked that a recommendation not be made on the magnet funding issue since settlement with the State of all funding issues was "imminent." After several subsequent requests for delays, the settlement of financial issues was finally consummated in April of 1989.
73. A public status conference was held on December 21 to determine compliance with 1988-89 plans. At that on-the-record conference, it was revealed, inter alia, that:
a. Lakewood Junior High School in NLRSD was out of compliance with guidelines set by the Eighth Circuit Court of Appeals;
b. NLRSD intended to wait until the 1990-91 school year to make corrections in the imbalance;
c. NLRSD still had not taken steps to remedy the disproportionality of pupils involved in extracurricular activities. A workshop was being planned, but no date had been set;
d. NLRSD still had not made an analysis of the disproportionate number of black males expelled from school;
e. NLRSD had declined to agree to any collaborative efforts with the other districts since NLRSD concluded there was "not enough specificity" in the plans of the other districts;
f. When asked about specific areas for collaboration such as special education, extracurricular activities, talented and gifted programs, and other areas where collaboration would reduce costs for all districts, NLRSD indicated the plans were not specific enough;
g. Concern was expressed that there did not appear to be "sufficient discussion going on" among the parties about collaborative efforts;
h. NLRSD reported no plan was in place to work toward reducing the disproportionate transportation burden between black and white children attending school in NLRSD;
i. NLRSD reported that no analysis had been made to determine whether, or which, teachers or administrators had made disproportionate referrals, by race, for disciplinary action;
j. NLRSD indicated no process in place during the current school year to analyze the disparate number of black males suspended from school;
k. The NLRSD personnel director indicated that efforts to recruit minority teachers had not been successful;
l. NLRSD reported the loss of eleven and the hiring of only eight black teachers for the current year;
m. NLRSD reported that it had "not been able in North Little Rock to attract black teachers away from the Pulaski County and Little Rock areas;"
n. NLRSD reported that there were currently no black principals in secondary schools in NLRSD, with the exception of the skills center;
o. NLRSD reported that there was only one black staff member in the central administration building;
p. NLRSD reported that there was no process in place to determine whether a black administrator would be available for assignment to vacancies in particular areas. NLRSD reasoned that since there was only one black member of the central administration, and he was already overcommitted, there was really no need for a process.
q. NLRSD reported that the disaggregation of standardized test scores done at the direction of the Special Master had revealed that black students in NLRSD were not achieving at the same level as white students in NLRSD. The data also revealed that as the grade level increased, the achievement disparity increased;
r. NLRSD reported that there was no compensatory education available in NLRSD to address the disparity, except for Federal Chapter I money;
s. NLRSD reported that there was no list made to determine the schools where the students were performing well and the *1185 schools where students were performing poorly;
t. Principals had not been contacted and informed whether their schools had performed well or poorly;
u. NLRSD repeated that it has no Office of Desegregation, but rather a "desegregation team." No minutes are kept of the desegregation team meetings.
v. Still, there had been no discussion by the desegregation team of the need or the process to eliminate the educational achievement disparity between black and white children in NLRSD;
w. As of the December 21, 1988, public status conference, NLRSD had no plan to eliminate the achievement disparity between black and white NLRSD students;
x. NLRSD reported that the disparity in NLRSD between black and white children is at least two and one-half years at every grade level;
y. At the ninth and tenth grades, NLRSD reported that black students score, on the average, almost four and one-half years behind the average white student;
z. NLRSD noted that without compensatory education programs, the pre-existing educational achievement disparity will not be closed;
aa. NLRSD noted that it has no compensatory education programs above the second grade for the current school year;
bb. NLRSD reported that there was no money in its budget which could be reallocated to compensatory education programs; and
cc. NLRSD reported that 63 of its teachers of the Gifted and Talented are white; one is black.
74. NLRSD has one black board member, elected in September, 1988. Pending in United States District Court is a Voting Rights suit against the NLRSD.
75. At a status conference on December 22, 1988, the LRSD reported on findings of the biracial monitoring committees in the Major Enhancement Schools. Deficiencies noted in the reports, issued in October 1988, were not scheduled to be acted upon until January 23, 1989.
76. LRSD's Associate Superintendent for Desegregation acknowledged that the delay was "unreasonable," but noted, "there are a lot of problems in the monitoring process that I am trying to adjust so that it can be more efficient."
77. The bi-racial monitoring report indicated a number of problems at Major Enhancement Schools.
78. The bi-racial committee report also indicated that in three classrooms of Garland Major Enhancement School, ninety percent of the students were not mastering the basic curricula.
79. The LRSD had failed to hire the staff development director, as required in the 1988-89 court-approved plan.
80. The LRSD reported that "the other big areas that we have focused on in cooperation with the other two districts, the State of Arkansas, through the Pulaski County Co-op has been that of multi-ethnic curriculum development."
81. The parties were informed on the record: "I think it is becoming more and more apparent that these areas of collaboration that lead to more cost-effective delivery of particular educational services are going to have to be worked on by the parties and maybe become more than just areas of collaboration. Maybe they are actually going to be areas of absolute cooperation in the delivery of the service, which could mean that the parties would develop a plan for the delivery of Gifted and Talented services in all three districts where all districts are cooperating to provide that service.
"I am not saying it will mean that, but I am saying it could mean that because of the financial problems that all three districts are currently facing."
82. A November, 1988, submission by the LRSD indicated that the LRSD had hired a director of staff development, as required by the 1988 plan. A subsequent report shows that a director was not hired and that the district was making a further search.
*1186 83. The LRSD had also failed to hire five staff development specialists as required by their 1988-89 plan.
84. It was revealed that LRSD had been cited by the Arkansas Department of Education for four violations of the State standards at two of the Interdistrict Elementary Magnet Schools.
85. It was revealed that the LRSD had failed to establish the district-level discipline review advisory committee, as required in the approved LRSD 1988-89 plan.
86. The superintendent of the LRSD indicated that the LRSD wanted to "join partnership in with the County schools immediately" in the area of Food Services.
87. PCSSD revealed educational achievement disparities between black and white students.
88. PCSSD had not developed a program to deal with the elimination of educational achievement disparities between black and white students.
89. Documents submitted by PCSSD indicated a 15 percentile drop in math scores of black children on standardized tests.
90. The PCSSD Associate Superintendent for Instruction acknowledged that current practices in PCSSD "aren't succeeding" in moving toward elimination of the documented disparity in educational achievements of black and white students, and that the district would have to "search for promising ones."
91. It was revealed that there had been no collaboration among the three districts to address the elimination of the disparity in achievement. The only interaction among the instructional supervisors was through association meetings through the Educational Cooperative.
92. January 3, 1989, the Joshua Intervenors sent a letter to the Special Master and all parties in which they recommended the following: "The recent problems surrounding the change of the opening and closing times at Parkview and Mann have highlighted the need for an interdistrict transportation commissioner who would be responsible for the administration and coordination of transportation in all three districts."
93. January 3, 1989, the Joshua Intervenors also sent a letter recommending that a Central Personnel Office be established to coordinate recruitment needs and other activities relative to the recruitment of teachers. "This office would be responsible for recruiting, employing, assigning or transferring, evaluating staff, and making recommendations for continued employment."
94. No party responded to the January 3, 1989, recommendations of the Joshua Intervenors.
95. On January 4, 1989, the Assistant Superintendent for Desegregation in the PCSSD sent a letter to the Special Master and to all parties stating that the PCSSD had actively participated in both the drafting and conception of the Interdistrict Desegregation Plan, but that if the City of Little Rock insisted upon requiring areas annexed into the city to be also annexed into the LRSD, "... it is my preliminary impression that this would financially handicap the Pulaski District, may impair our ability to effectively desegregate and certainly has practical and psychological impacts upon our decision whether to continue to fully endorse and participate in the interdistrict plan ... I understand that you will be soon addressing the interdistrict plan and we felt it appropriate to inform you of our present concerns."

DISCUSSION AND RECOMMENDATIONS

I. Metropolitan Supervisor of Desegregation Services & Programs:

While the parties have begun to talk about cooperation, the time has come to act. Accordingly, as is explained by the findings of fact and conclusions set forth, it is recommended that the court require the immediate merger of the functions designated herein critical to the success of the stated goal of all the parties as well as the court: high-quality desegregated education for all children in the County.
*1187 It is recommended that the court appoint a person to coordinate, direct and oversee the merged functions and all elements of the desegregation plan approved by the court. For the purposes of this recommendation, I have referred to that person as the Metropolitan Supervisor of Desegregation Services and Programs (Metropolitan Supervisor).[5] That person should have a minimum staff; should be empowered to give counsel and direction to the superintendents of the local districts; should meet frequently with the local district superintendents and boards, but should be accountable only to the Court. If the local boards and the Metropolitan Supervisor are unable to resolve a conflict, resolution should be by the United States District Court.

II. The Financial Settlement with the State:

The three school districts have entered into a Financial Settlement Agreement with the State of Arkansas and have asked for this court's approval. The money agreed to must be carefully managed. Every dollar possible should be spent for the direct benefit of the children in the three school districts. "Autonomy" is simply no justification to waste precious tax dollars on duplicative, and often conflicting efforts. All three districts have complained that the Settlement amounts are not sufficient to provide the quality of education they feel is needed. It is incumbent upon the court to ensure that all available money is spent in a manner which will most effectively and efficiently desegregate and contribute to raising the quality of education for the children of the three districts. One hundred twenty million dollars may not be sufficient.[6] However, since the parties have agreed to limit the State's liability, recognizing their continued responsibility to implement a constitutional plan, it is recommended that the Settlement be approved with certain clarifications and conditions.
A. The magnet "surplus" referred to on page three of the Settlement document should not be distributed immediately, but should be held for a period of three years to ensure availability of sufficient funds in future years.
B. There should not be an absolute restriction on creation of new Magnets as long as their financing is not inconsistent with the terms of the Settlement.
C. It should be clear that being an "independent, sovereign desegregating school district" as referred to on page 10 of the Settlement Agreement, does not mean the districts could not be ordered to merge functions for the purpose of maximizing the success of mandated desegregation programs.[7]
D. Dismissal of the State must be conditioned upon the timely fulfillment by the State of all of its obligations under terms of the Settlement and must relate only to those violations pre-dating the approval of the Settlement. However, the financial obligation assumed by the State in the Settlement Agreement should, when paid, be considered a full, final and complete discharge of its obligations. I recommend that the case against the State be administratively *1188 closed, subject to reopening only upon a Motion to Show Cause for failure to comply with the terms of the Agreement. Absent such default, I recommend that the State be considered dismissed from this lawsuit.
E. The parties' Agreement to petition for rededication of millages erroneously omitted from the petitions of December, 1986, and January, 1987, should be granted only on condition that this court's ordered regarding desegregation requirements be accepted and implementation commenced no later than July 1, 1989. Without such conditions the court will place the public in a position of having millages rededicated without assurance that the money raised will be used to comply with orders of the court.

III. The Long-Range Student Assignment Plans:

A. Little Rock School District
The Little Rock School District, still recovering from the impact of an ill-conceived and poorly implemented "controlled choice" student assignment plan in 1987-88, moved for a stabilizing year to be used to carefully plan for the 1989-90 school year and beyond. A detailed plan for the 1988-89 school year was submitted, recommended and approved by the district court.
For 1989-90 and beyond, it is recommended that the general long-range concepts now proposed by the LRSD be approved. That is, the long-range plan should provide for specific area attendance zones, and for feeder patterns, as proposed by the LRSD and endorsed by the community.[8] However, the LRSD has failed to demonstrate how it would successfully implement the general concepts proposed. The "plan" lacks sufficient detail and clarity to evidence a probability that the concepts will be implemented successfully by the LRSD. With the approval of the general concepts, the parties should be ordered to redraw some attendance zones and feeder patterns, as necessary, using schools in all three districts in order to reduce bussing, to shorten the distance students must travel, to reduce the transportation disproportionality between races and to otherwise comply with the mandate of the Eighth Circuit.
The vague, indecisive and ever-changing nature of the LRSD "plan" is apparent. The proposed LRSD plan can be summarized as follows: The district would create eight Incentive Schools. These elementary schools would be virtually all-black, at least initially, and would accommodate some 3500 to 3800 black students.[9] Double funding to the Incentive Schools would make possible enhanced programs to ensure excellence and progress toward elimination of the achievement disparities between black and white students. However, the double funding was guaranteed to run only for six years.
There were no details provided in the March, 1989, plan for integrating the Incentive Schools. The "plan" to integrate the schools over a six-year period consists of the following:
The Incentive Schools will be desegregated in phases through a combination of *1189 white recruitment into the Incentive Schools, and by reserving a designated number of seats in each incoming kindergarten class for the enrollment of white students. As new Interdistrict Schools are established those seats attributable to LRSD will be available for those students who otherwise would or could have been assigned to an Incentive School; any recruitment and/or any assignment shall be in accordance with each district's student assignment plan.
The LRSD was asked repeatedly, both orally and in writing, for systematic, detailed plans for the integrating of the Incentive Schools. The March, 1989, submission is painfully lacking. It is obvious that without a great deal more planning, and monitoring, the Incentive Schools would remain virtually all-black at the end of the proposed six year plan. The inadequacy of the plan for transferring/reassigning students from Incentive Schools to Interdistrict Schools is discussed more fully below.
The LRSD had an opportunity to display a genuine commitment to educational excellence in racially identifiable schools during the 1988-89 stabilizing year. A number of schools were designated as "Major Enhancement Schools" for the 1988-89 school year. Special programming and renovations were to have provided an enhanced learning opportunity for those children in racially isolated settings. As is apparent from the Findings of Fact and from the transcripts, LRSD reneged on its commitments at virtually every Major Enhancement School during the 1988-89 school year.
A lack of follow-through on the part of LRSD was glaringly revealed at the frequent compliance status conferences conducted in an effort to maximize the possibility that promises made by the LRSD would be kept. At each status conference the testimony reflected substantial noncompliance.
The LRSD proposed in its long-range plan to increase the white percentage at the Elementary Academies (the non-magnet, non-incentive, non-interdistrict elementary schools) over the six year period of the plan: "The recruitment of white students to Elementary Academies may increase the percentage of white students at these schools but no school shall have a racial composition of greater than 60% white."
Though the transportation burden is but one factor to be considered in evaluating the proposed plan, in this case the inequity in the bussing burden argues forcefully against approval of the LRSD plan. For the duration of the proposed six-year LRSD plan, one hundred percent of the mandatory bussing burden would fall on the black children who are unable to secure a place in their neighborhood (Incentive) schools. All mandatory bussing was proposed to be from East to West, black children into white neighborhoods. Not only would the bussed black children bear the entire transportation burden, but they would also be the same children deprived of the enhanced programming in the proposed Incentive Schools. Those black children living in the eastern section of the city fortunate enough to have a choice would have to choose between attending a segregated school in their residential area or riding a bus to an integrated school. Conversely, children living outside the inner city area would theoretically[10] have a choice of attending an integrated school close to home, or riding a bus to a segregated school. This method of integrating the Elementary Academies is an unlawful detriment to a group of victimized children whom the Eighth Circuit intended to be the beneficiaries of a constitutional desegregation plan.
Approval of the LRSD long-range plan would have resulted in progressive segregation of elementary schools over a six year period. At the end of the six years, the Incentive Schools would have been all black and the Elementary Academies majority *1190 white. Double funding for the Incentive Schools would have ended and there would have been no justification for their continued existence. Assuming the LRSD's proposed plan would be entirely successful, the non-incentive elementary schools (Elementary Academies) would all be majority (60%) white; and the six-year hiatus from litigation would end.[11] Thus, in the year 1994  forty years after Brown v. Board of Education, Little Rock, Arkansas, under a best case scenario, would again begin the development and implementation of a school desegregation plan. It is difficult to conjure a more unstable, unpredictable course for Pulaski County, Arkansas.
The price extracted from the children for "getting out of court" for six years is simply too high, in terms of retreat from the goal of high quality desegregated education for all children, and in terms of disruption and instability. These children are the victims of the incremental effect of prior unconstitutional acts. I cannot, in good conscience, recommend this six-year appearance of peace-at-any-price. The children of this county deserve stable and predictable school assignments for more than six years at a time. It is possible, and necessary, that the parents, patrons and educators of Pulaski County perfect and put into place a lasting peace, a plan with a framework that promises to work now, and in six years, and in ten years, and in twenty years.
Lack of detailed planning and programming for the Incentive Schools is another critical deficiency of the LRSD plan. The plan adequately explains why the Incentive Schools, but fails to explain how. In spite of months of prodding, the high-quality educational component is incomplete. Neither parents nor teachers could possibly know what to expect in the Incentive Schools from reading the plans. It is apparent from the poor implementation in the Major Enhancement Schools in the 1988-89 plan and from the admittedly disastrous implementation of the controlled choice plan in 1987, that LRSD's continued difficulty with implementation of plans warrants the court's insistence on detailed planning, careful monitoring and periodic measurement of performance. The availability of "double funding" is meaningless if the programs on which the money is spent are not designed and implemented to achieve educational excellence.[12]
The refinement of the LRSD long-range plan in conjunction with those of NLRSD and PCSSD will require expert help. The refinement process should be directed and overseen by the Metropolitan Supervisor described above. The Metropolitan Supervisor should be directed to oversee the development and implementation of plans consistent with the general concepts approved herein of keeping children from the same neighborhood together and establishing sensible feeder patterns. The plan may include provisions for Incentive Schools, which may temporarily be all-black, but if so, the plan must detail the efforts to be made in those schools so they will eventually be desegregated.

B. Pulaski County Special School District
It is recommended that the concepts proposed by the PCSSD be approved. The PCSSD plan contemplates voluntary measures, many of which show promise, to move all schools within the Eighth Circuit guidelines. The proposal to make College Station Elementary School a Talented and Gifted Specialty School is recommended for approval. Also, the various proposals to increase the percentage of blacks in schools *1191 where the non-black population exceeds the Eighth Circuit guidelines are recommended for approval. However, it is clear that a sensible, workable, long-range solution to the enormous geographical problems facing the PCSSD must include some student assignments across district boundary lines. In order to minimize bussing, PCSSD must, in some cases, use schools in the other two districts and permit its schools to be used where common sense and efficiency dictate such a solution. Accordingly, the refinement of the long-range plan for PCSSD should also be directed by the Metropolitan Supervisor, in coordination with the other two school districts (See also p. 51, et seq.).

C. North Little Rock School District
The North Little Rock School District frequently and correctly points out that its long-range "Storm Plan" under which students are assigned has been approved by the Eighth Circuit Court of Appeals. However, as illustrated by the Findings of Fact, the NLRSD must analyze data and develop strategies and plans to deal with serious problems in its current system of delivering educational services to black children. Educational achievement disparities are staggering in NLRSD, and the lack of a plan or process to address the disparity is alarming. NLRSD is in dire need of handson assistance in recruiting black teachers and administrators. NLRSD has moved for modification of its plan for the 1990-91 school year. The court granted conditional approval. Now, it is recommended that the district court require the NLRSD reorganization be done in conjunction with long-range planning in the other two school districts.

D. Interdistrict Plan
The Interdistrict Plan submitted by the three districts includes many concepts which are not only positive, but essential to achieving high-quality, desegregated education in the three districts. Yet the parties have failed to demonstrate how the proposed Interdistrict School would be implemented in a way to ensure the possibility, much less the probability, of their success. The Interdistrict Plan, submitted February 15, 1989, contemplates the mandatory assignment of children to Interdistrict Schools within their home districts. Children residing outside the district in which the Interdistrict School is located would be recruited on a voluntary basis.
The recruitment of sufficient numbers of children to schools outside their current school districts is possible only if there is an absolute commitment and dedication. Neither PCSSD nor NLRSD has ever filled all of its allotted seats in magnet schools located in the LRSD. Recruitment to Interdistrict Schools, which will not have "magnetic" programming would be significantly more difficult. Mandatory assignment across district lines will be required if these schools are not voluntarily integrated. A sensible, systematic strategy for assigning students to Interdistrict Schools must be developed and be effective for the 1990-91 school year and beyond.
Perhaps the most troubling aspect of the Interdistrict proposal is the reliance the LRSD places on the Interdistrict Schools to eventually integrate its proposed all-black Incentive Schools. Knowing the efforts required to recruit white students from the PCSSD and NLRSD to magnet schools, the LRSD surely cannot reasonably rely entirely upon the voluntary recruitment efforts of the PCSSD and the NLRSD to integrate these schools.
While only one Interdistrict School, Dunbar, is being recommended for the 1989-90 school year, a new Stephens Interdistrict Early Childhood Center should be approved for the 1990-91 school year. Other Interdistrict Schools, and a sensible student assignment plan, which promises to work now and in the future, should be developed and implemented under the supervision of the Metropolitan Supervisor, in consultation with the patrons and local school boards.
The purpose of Interdistrict Schools must be the promotion of high-quality desegregated education in compliance with guidelines which the Eighth Circuit Court of Appeals will find reasonable. Accordingly, *1192 the parties should refrain from offering frivolous appearing proposals such as the February 15, 1989, PCSSD proposal which appears to suggest that a change in the designation of Harris from a PCSSD school to an Interdistrict School instantaneously permits PCSSD to send more black children to Harris. High-quality, desegregated education must be understood as a substantive process rather than a trivial word game.
The proposed Interdistrict Plan reflects a willingness among the districts to cooperate, but the offer is contingent, vague and unconvincing in light of the history of this case. In 1987, at the urging of the three school districts, the United States District Court established the Pulaski County Educational Cooperative for the express purpose of implementing joint cooperative efforts among these three school districts. The cost of the Co-op, several hundred thousand dollars, was born by the State of Arkansas. Had the parties cooperated in good faith, the Co-op could have obviated the current recommendation for merger of functions, discussed more fully below. Instead, the districts chose not to use the Co-op in any meaningful way, and now ask, in their financial Settlement with the State, that it be dismantled and discontinued. The waste occasioned by the lack of cooperation in a number of areas should not be countenanced by the court in light of the limited dollars available. The offers of "cooperation" proposed in the Interdistrict Plan fall short of the offers made at the time the court approved the Educational Co-op, and are simply insufficient.[13]
Furthermore, the cooperation promised between PCSSD and LRSD is certain to be strained over the issue of further annexations from the PCSSD into the LRSD. The PCSSD notification to the court and the parties that any attempt by LRSD to annex areas currently in PCSSD would cause PCSSD to rethink its commitment to Interdistrict cooperation illustrates the fragile nature of the promise to cooperate. Nothing in any of the plans addresses the problem, sure to arise within a matter of months, of how to handle future annexations by the City of Little Rock. Even if the districts could agree on where students would be assigned from those areas in dispute, the issue of which district would get the tax base would not be easily resolved.
The February 15, 1989, Interdistrict Plan does identify areas of collaboration and cooperation which the parties felt should be pursued: curriculum and programming; joint federal grant applications; summer school; services for the handicapped; staff development; special education; evaluation of programs; vocational education; guidance and counseling; parent and community involvement; elimination of achievement disparities; recruitment and hiring; evaluation of program success; magnet schools; Interdistrict Schools.
Other areas identified by the parties, in a September 19, 1988, submission, as appropriate areas of collaboration were deleted from later submissions: talented and gifted curricula, staff development, research and administration; compensatory and remedial education programs; and library media services.

E. Merger of Functions
Although the parties repeatedly acknowledge the necessity for collaboration and cooperation, they fail to explain how the acknowledgement moves them any closer to implementing the cooperation than did the failed Educational Cooperative. It is now recommended that the Interdistrict cooperative effort should be formalized under the authority of the Metropolitan Supervisor and at least the following functions be merged: student assignments, purchasing, *1193 education for the handicapped, education of the talented and gifted, guidance and counseling (including home based counseling), staff development, building and maintenance, fiscal accountability, monitoring and evaluation (including metropolitan bi-racial committees, local school bi-racial committees, compliance with timelines, etc.), elimination of education achievement disparities, personnel recruitment and assignment, curriculum development, patron and community involvement, summer school, library-media services, vocational educational services (as presently), security, disciplinary procedures (including suspension and expulsions), etc., development and operation of magnet schools and determination of new magnets, affirmative action, extracurricular activities, and M-to-M transfers.
The need for merger can be illustrated by elaboration on a few additional functions. Transportation will remain a major challenge for the 1989-90 school year in LRSD since most student assignments will remain the same. It is difficult to adequately convey the impracticality and astronomical costs in both time and money associated with the current LRSD assignment plan. Nonetheless, the transportation dilemma could be eased if the three districts shared a metropolitan transportation system, rather than competing for personnel, tracing routes, and duplicating administrations. The Interdistrict Plan contemplates large numbers of M-to-M (Majority to Minority) transfers among the districts. Additionally, the General Assembly of the State of Arkansas has enacted legislation to permit cross-district transfers. Such transfers will be permitted in these three districts to promote each district's desegregation plan, whether or not the transfer technically qualifies as a majority to minority transfer. It is simply impractical not to coordinate and merge the transportation network. It is recommended that the districts be required to merge transportation functions under a Director of Metropolitan Transportation.
The districts should be required to establish a joint personnel recruitment and assignment office to serve as a common clearing house for applicants for both certified and non-certified positions. This would obviate multiple submissions by applicants, duplication of processing efforts, and would greatly simplify and enhance each district's efforts to recruit and hire teachers in areas of great demand. Additionally, a central personnel recruitment and assignment office will solve a problem which exists among the districts: the competing affirmative action hiring goals of the districts, coupled with a limited, and perhaps insufficient number of black teachers, results in counter-productive rather than mutually supportive efforts. Testimony in this case supports the conclusion that a common applicant pool would benefit all school districts. Responsibility for affirmative action strategies should be included in the merged recruitment and assignment center.
Food service is an area in which merger could result in substantial savings for all three school districts. The LRSD superintendent, in testimony, acknowledged the feasibility and desirability of taking advantage of PCSSD's excellent food service capabilities. It is recommended that the districts be required to merge this function, as a cost-reducing measure.
The entire county will benefit from a merger of the offices for Community Relations (which include the following, among others, in the districts: VIPS, PALS and Partners in Education). Rather than have the three districts compete for business and community support, a Director of Community Relations could promote cooperation and reduce competition for badly needed support. A merged Office of Community Relations would not only prevent duplication of efforts but would present a unified front in the essential effort to strengthen the community-school link.
Because the districts have defaulted on their promise to cooperate through the Educational Cooperative, it is recommended that all areas of collaboration and merger be delegated to the Metropolitan Supervisor for oversight and implementation. Obviously, the timetables of merger will vary. *1194 However, the parties must be required to commence formal collaboration immediately in the above areas.
It is anticipated that the merger of the aforementioned functions will result in substantial savings to all three school districts. Each district concedes that, even with the financial settlement with the State of Arkansas, money remains a problem. In fact, the LRSD flatly states in the February 15, 1989, plan: "Further, even if the settlement is approved, LRSD will need additional funds before it can implement the plans." Those savings will then be available for expenditures essential to the delivery of the caliber of educational services needed to eliminate the problems identified by all three districts during our hearings, i.e., educational achievement disparities, disproportionate transportation burdens, disproportionate referral of black students to special education, disproportionate suspension and expulsion of black pupils, disproportionate enrollment by race in talented and gifted, advance placement and accelerated learning classes.

IV. School Assignments for the 1989-90 School Year:

A. The LRSD asked for "grandfathering" (permitting students to remain in current schools) and insisted upon it even after it was pointed out that grandfathering was inconsistent with the concept of permitting children from the same neighborhood to go together to the same school, a theme promised by the district in its October, 1988, submission, and reiterated by LRSD patrons in Public Hearings held January 12 and 13, 1989. The LRSD generated a widespread letter writing, telephone and media campaign in support of grandfathering. The district's most recent submission acknowledged the problems related to grandfathering, but insisted that this provision was necessary to add stability and to be faithful to other promises made to its patrons. Accordingly, because of LRSD's insistence and because additional work must be done on attendance zones and feeder patterns during the summer and fall of 1989, it is recommended that all students in LRSD be reassigned to current schools for the 1989-90 school year except as follows:
1. The LRSD, in its October submission, proposed the continued exclusion of kindergarten students from the mandatory assignment plan. In subsequent submissions of January 31, 1989, and March 23, 1989, the district included the kindergartners. It is recommended that for the 1989-90 school year, kindergarten students not be included in the mandatory assignment plan, but be permitted to enroll in kindergarten as proposed in the October submission and as publicized and discussed at public meetings held between October, 1988 and January, 1989. However, in the long-range plan, kindergarten pupils should be included and assigned in accordance with attendance zones and feeder patterns which assure that children from the same neighborhood can attend school together.
2. To resolve special enrollment problems created by the increased capacity at the new Washington Elementary School, it is recommended that kindergartners presently attending King be assigned as first graders to Washington Elementary.
3. It is recommended that Woodruff Elementary be closed as an elementary school at the end of the current school year, as proposed by the LRSD. Pupils currently in grades kindergarten through five at Woodruff should be assigned to the new Washington Elementary School.
4. Elementary students in any school in the LRSD attending racially isolated classrooms during the 1988-89 school year should be allowed to transfer to Washington for the 1989-90 school year. In the event of a capacity problem, preference should be given to students living closest to Washington School.
5. With the exception of Dunbar Junior High School, students entering seventh and tenth grades in the fall of 1989 should be assigned according to the attendance zones and feeder patterns proposed by the LRSD, since the proposed attendance zone assignments can be implemented at the entry level grades without complications and disruptions.
*1195 6. Dunbar Junior High School should open in the fall of 1989 as an Interdistrict Specialty School for International Studies and for Talented and Gifted Education.[14] The 1989-90 enrollment at Dunbar will result from the recruitment of current students at the school and sixth grade students currently attending Gibbs International Magnet. Those students will be given first preference. New seventh graders living in the proposed Dunbar attendance zone should be given second priority in the event of oversubscription, but should not be required to attend if they have no interest in the specialty programs. Other students should be recruited from overcrowded schools and schools out of compliance with the Eighth Circuit mandates in all three districts. In the event LRSD junior high school capacity problems arise, they should be resolved by mandatory interdistrict assignments. Dunbar should continue as an International Studies and Talented and Gifted School in the long-range plan, and students who enroll for the 1989-90 school year should be assured a seat, regardless of the specific long-range plan developed and approved.
The persons responsible for programs for the Talented and Gifted in all three districts should be directed to begin immediately planning and recommending curricula and programming for the Talented and Gifted specialty component at Dunbar. Such plans should be submitted to the Metropolitan Supervisor for approval and implementation.
7. The use of pairings is only one of the many tools available, but not proposed by the districts, as a means of keeping neighborhood children together in the same school. In an effort to show some progress toward the actual desegregation of schools in the LRSD and the PCSSD, as has already been demonstrated in the NLRSD, it is recommended that in the LRSD for the 1989-90 school year and beyond: Romine should become a Pre-Kindergarten through grade 2 Early Childhood Center and should be paired with Fulbright (or some other school determined by the LRSD with an excess white pupil population) which should open as a grade 3-6 Academic Development Center. Similarly, Franklin should open as a Pre-K through grade 2 Early Childhood Center and be paired with McDermott (or some other school to be determined by the LRSD with an excess white enrollment) which should open as a grade 3-6 Academic Development Center. The newly proposed LRSD attendance zones should be used to determine the students to be assigned to these paired schools.
Students currently attending the schools to be paired who live outside the newly proposed attendance zones shall have the option to reenroll in the paired schools if their race, grade level and school capacity permit; or they will be permitted to seek a desegregative transfer, described below, with a guarantee that they will not again be involuntarily transferred. It is recommended that the LRSD be ordered to immediately determine and notify the pupils to be assigned to the paired schools; form and activate biracial parent, student and teacher committees; develop and implement receiving school plans; commence the planning of curricula offerings in consultation with parents, teachers and administrators.
8. Between May 25, 1989, and June 10, 1989, any student desiring a change of school assignment may request such change stating reasons therefor. All transfer requests will be considered at the same time. Approvals will be simultaneously determined. If a request adversely affects the desegregation efforts of the sending or receiving schools it will be denied. In the case of oversubscription, preference should be given first to siblings of students in the receiving schools, and second to students living closest to the receiving school.
It is also recommended that a bi-racial metropolitan student assignment appeal *1196 board be created to consider appeals from those whose requests are denied. The Metropolitan Supervisor should receive an advisory opinion from the appeal board and be empowered to make a final decision consistent with the requirements of the Metropolitan Desegregation Plan.
9. With modifications, the Incentive Schools should be approved for 1989-90. The LRSD proposed eight Incentive Schools, however, it is recommended that only current Major Enhancement Schools (Rockefeller, Ish, Garland, Stephens and Mitchell), Rightsell Elementary (currently a minor enhancement school) and the new Washington School become Incentive Schools for the 1989-90 school year. Except as specifically recommended herein, only students currently attending Major Enhancement Schools will be permitted to attend the Incentive Schools. However, no students will be required to remain in Incentive Schools if they prefer desegregative transfers.
The LRSD, the Joshua Intervenors and the Knight Intervenors should immediately begin to plan and set forth, by July 1, 1989, the curricula and programming for the Incentive Schools, to be submitted to the Metropolitan Supervisor for approval.
B. The problem in the PCSSD is what to do about those schools which exceed the 30-34% maximum black population used as a guideline by the Eighth Circuit in its opinion of February 9, 1988.[15] The PCSSD plan contains nothing which guarantees a reduction of the black pupil population in any of those schools. For the 1989-90 school year, the maximum percentage of blacks should be raised to 42% in order to prevent an unacceptable bussing burden. It is recommended that PCSSD be allowed to pursue its voluntary plan to raise the black percentage in its schools below the minimum black percentage required by the Eighth Circuit guidelines.
Other PCSSD schools in which the black population exceeds 42% must be brought within the 42% range, except that special recruitment efforts may be used to move Bates Elementary into compliance voluntarily.
It is recommended that PCSSD be required (by mandatory assignment if necessary) to bring Landmark Elementary (50% black), Fuller Elementary (58% black) and Fuller Junior High (44% black) within the 42% guideline in 1989-90 in anticipation of a Metropolitan Desegregation Plan for 1990-91 and beyond. The Metropolitan Plan will include more schools with pupils attending from two or more districts.[16]
C. North Little Rock School District should be permitted to devise a plan to bring Lakewood Junior High School into compliance for the 1989-90 school year.

V. Administration and Faculty:

It is recommended that the proposal of the LRSD and other parties to vacate and reconstitute the administrations and faculties in all Incentive Schools be approved. Further, it is recommended that the administrations and faculties in Dunbar TAG/IS Interdistrict School and in the four paired schools be vacated and reconstituted. The court should require that the process for reconstituting the administrations and faculties include parents, students, teachers and administrators, and be completed prior to the close of the current school year.

VI. Portable Buildings:

Unquestionably, portable buildings are educationally undesirable and, too often, are obstacles to the success of efforts to desegregate. It is recommended that the use of portable buildings be discontinued at any school where their continued use would result in the reflection of segregated residential patterns in the school population. *1197 It may be necessary to phase out the use of portables on a scheduled to be determined by the Metropolitan Supervisor.

VII. Additional Magnet Schools or Programs:

The role of the Magnet Review Committee should be reevaluated by the Metropolitan Supervisor, particularly in light of the Financial Settlement Agreement entered into by all parties. In that Agreement, all parties agreed that no new Magnet Schools would be proposed by any of the parties.
The Metropolitan Supervisor should review the desirability of additional magnet schools. If additional magnet schools are developed, they should be located in areas traditionally hard to desegregate in order to more equitably spread the transportation burden. In accordance with the Financial Settlement Agreement recommendation above, it is recommended that any new magnets be created and funded in a manner which is not inconsistent with the terms of the Settlement Agreement.

VIII. Other LRSD, NLRSD and PCSSD Schools and Proposals:

All other proposals agreed upon and jointly submitted by the parties which have no adverse impact upon other specific recommendations made to the court are recommended for approval.
DATED this 10th day of May, 1989.
 Respectfully submitted,
 Aubrey V. McCutcheon, Jr.
 Aubrey V. McCutcheon, Jr.
 Special Master
NOTES
[1] According to figures provided by the two school districts in March, 1989.
[2] In the case of Bates Elementary, this PCSSD school is actually located inside the boundary of the LRSD. With a current black population of 49%, Bates is outside the PCSSD guideline (excess black), and also outside the LRSD guideline (excess white).
[3] The 1988-89 court-approved plan left several schools with black percentages above the Eighth Circuit guideline. Those schools, denominated "Major Enhancement Schools" (Rockefeller, Ish, Garland, Stephens and Mitchell) were to receive enhanced programming and building renovations and repairs. The Eighth Circuit, in an opinion issued February 9, 1988, required that educational programs "be implemented in the racially identifiable schools ... similar to those required for the non-integrated schools in St. Louis [citation omitted], but carefully tailored to meet the needs of Little Rock students." Little Rock School District v. Pulaski County Special School District, et al, 839 F.2d 1296, 1307 (8th Cir.1988).
[4] The district court had previously been affirmed in holding LRSD in contempt for its failure to comply with court orders. In stern language the court warned: "However, the LRSD Board, the LRSD administration and its attorneys are put on notice that I will regard as extremely serious, subject to severe sanctions, any further delay in the implementation of the orders previously issued in this case with regard to magnet schools."
[5] I indicated in my oral recommendations, made April 19, 1989 in open court that I would recommend that the person appointed by the court be called the "Metropolitan Superintendent." As with all prior drafts to recommendations, I invited the parties to make suggestions and comments, as is provided in Rule 53, Fed.R. Civ.Proc., to clarify the recommendations. Only two suggestions or comments were made: (1) the term "Superintendent" is a term of art in Arkansas law, thus it was suggested that a different terminology would avoid conflict; and, (2) the Knight Intervenors delivered a sixteen-page letter, which endorsed the concept of the metropolitan authority. In addition, the LRSD sent a list of important questions to be addressed dressed during additional desegregation planning and Joshua Intervenors submitted useful information related to the educational program for the Incentive Schools.
[6] It should be noted that the $120,000,000 will be spent on 60,000 school children over many years.
[7] It should be noted that the Senate Education Committee of the 1989 General Assembly of the State of Arkansas recommended passage of a bill which would have consolidated these three school districts.
[8] The plans submitted by the parties do not define or guarantee "neighborhood schools." This recommendation is that the long-range plan be designed so as to assure that children who live in the same neighborhood will be allowed to attend school together.
[9] The March, 1989, plan fails to clarify confusion as to capacities of Incentive Schools. The plan guarantees a 20:1 pupil/teacher ratio, but all of the classrooms in all of the Incentive Schools are figured in the March Plan at 25 students per classroom.

The LRSD plan acknowledges that Arkansas accreditation standards permit as many as 25 students per elementary classroom only in fourth, fifth and sixth grades. This departure from State standards is particularly troubling since Incentive Schools were to have included pre-kindergarten, kindergarten, and grades one through three as well as grades four, five and six.
The district's intent concerning Incentive School capacities is set out in the February 15, 1989, Interdistrict Plan at Page 4: "There shall be a limited number of Incentive Schools ... sufficient to accommodate that number of black students who, by attending these schools, make it possible to achieve a student population in the remaining Little Rock schools (Elementary Academies) of 55% black and 45% white with a variance of 5%."
[10] The plans did not provide classroom capacity to accommodate all of the black children necessary to sufficiently reduce the black percentage in the Elementary Academies. Thus, there would have been no seats available for white children, even if they had elected to attend an Incentive School.
[11] It is important to note that the Joshua Intervenors have not agreed to an absolute moratorium on litigation for six years. The district would always have been subject to actions to enforce compliance with approved plans. As noted, LRSD has shown some difficulty in actually delivering on its promises to the court and to the other parties.
[12] For example, LRSD proposes that Latin be taught for fifteen to twenty minutes per day in the fifth and sixth grades at Incentive Schools. LRSD suggests that the regular classroom teachers could conduct the Latin classes after having six hours of inservice training in Latin during the summer.
[13] For example, in the Interdistrict Plan, the parties state: "Because of the circumstances unique to the NLRSD and its desegregation plans, the NLRSD cannot agree to participate in all of the programs, procedures or policies set forth in this document ... The mention of NLRSD by name in one sentence or paragraph does not imply that the NLRSD is included in preceding or succeeding sentences and paragraphs. Terms such as `multidistrict', `the districts', `districts in Pulaski County', `the parties', or `tridistrict', and generic terms, do not include NLRSD unless the NLRSD so chooses." (emphasis original).
[14] Although all magnet proposals were later deleted from its plans, in its October plan, the LRSD proposed and publicized for purposes of the public meetings and hearings, that Dunbar Junior High School should be an International Studies Magnet school-within-a-school.
[15] The range for PCSSD elementary schools is 20% to 34% black. The range for PCSSD secondary schools is 18% to 30% black.
[16] College Station has been recommended for approval as a Talented and Gifted Specialty School and Bates will be allowed to rely on voluntary recruitment. With the creation of Dunbar as an Interdistrict School, PCSSD should be able to recruit a sufficient number of students from Fuller Junior High School to bring that school from 44% to 42% black.